

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 04-42101** |
| **MICHAEL E. A. S. YOUNG,** | § | **Chapter 7** |
| Debtor. | § | |
| | § | |
| **MICHAEL E. A. S. YOUNG,** | § | **Adversary No. 04-4164** |
| Plaintiff, | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KEY CORP. TRUST and THE** | § | |
| **EDUCATIONAL RESOURCES** | § | |
| **INSTITUTE, INC. A/K/A THE** | § | |
| **EDUCATION RESOURCES** | § | |
| **GROUP,** | § | |
| Defendants. | § | |

## MEMORANDUM OPINION[1]

On October 11, 2005, the Court held a trial on this adversary proceeding to determine the dischargeability, under section 523(a)(8) of the Bankruptcy Code, of certain student loan obligations. This opinion shall constitute the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.    JURISDICTION

The Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This matter involves determination of the dischargeability of a debt and, as such, constitutes a core proceeding pursuant to 28

---

[1]    This Memorandum Opinion is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case, or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

U.S.C. §157(b)(2)(I) and (O) upon which the Court may enter final judgments.

## II.     ARGUMENT OF THE PARTIES

The debtor herein requests the discharge of certain student loan obligations asserting that excepting such debts from discharge will constitute an "undue hardship" on him and his minor child.  In the alternative, the debtor asserts that a partial discharge of such debts is warranted and appropriate.  The creditor objects and asserts that the debtor is simply under-employed at the current time and should be able to find employment in the field in which he was trained which is sufficient to repay the debts he incurred in obtaining his education.

## III.     FINDINGS OF FACT

On May 3, 2004, Michael Edward Anson Storm Young (the "Debtor") filed a petition for relief under Chapter 7 of the Bankruptcy Code.  On July 29, 2004, the Debtor filed his ORIGINAL COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT (the "Complaint") initiating this adversary proceeding.  The Complaint seeks to discharge the Debtor's obligations to The Education Resources Institute, Inc. a/k/a The Education Resource Group ("TERI") and Educational Credit Management Corporation ("ECMC", and collectively, with TERI, "Defendants").

### Identity of the Educational Loans

In August of 1993, the Debtor obtained an educational loan through Education Loan Services, Inc.  In January of 1995, the Debtor obtained an educational loan under the Law Access Private Consolidation Loan Program through Society National Bank.

The lender's agent for this private consolidation loan was American Education Services (formerly known as Graduate Loan Services), a division of the Pennsylvania Higher Education Assistance Authority ("PHEAA"). All right, title and interest in these loans were transferred to TERI (the "TERI Loans"). The balance on the TERI Loans, as of August 24, 2004, was $63,610.05, including principal and interest which accrues at a fixed rate of 8% per annum.

On or about April 5, 1995, the Debtor received an additional educational loan in the amount of $93,752.51 from the Keycorp Student Loan Trust. The guarantor of this loan was also the PHEAA. On or about November 3, 2004, all right, title and interest in this loan was transferred to ECMC. The balance on the note, as of September 27, 2005, was $167,546.25, including principal and interest which accrues at a fixed rate of 8% per annum.

## Factual Background

In the fall of 1986, the Debtor began his undergraduate course of study at the University of Missouri. In May of 1990, the Debtor received a bachelor's degree from the University of Missouri in Political Science. It was the Debtor's intent at this time to pursue a law degree. The Debtor selected Southern Methodist University ("SMU") because he was accepted and because of its proximity to family.

In the fall of 1990, the Debtor began his studies at SMU. At the end of his first year of law school, the Debtor was ranked 250 out of 262 students. The Debtor opted to sit out one semester during his second year of law school because of stress-related issues.

For some period during law school, the Debtor was employed by a small family law firm in the Dallas area. The Debtor was not extended an offer of permanent

employment after graduation and the law firm no longer exists.  The Debtor applied for other jobs in the fall of 1992 and spring of 1993 without any success.

In August of 1993, the Debtor graduated from law school with a 76% grade point average.  The Debtor was not ranked with his classmates because of his summer graduation date.

In the fall of 1993, the Debtor enrolled at Georgetown University to pursue an L.L.M. in International and Comparative Law.  He hoped that when he completed the program, his employment opportunities would improve.  The Debtor obtained additional student loans to fund these studies.

For some period while attending Georgetown, the Debtor was employed by a Kansas City law firm, Gage & Tucker, in their Washington, D.C. office, which had only one resident attorney.  The Debtor's job at Gage & Tucker involved researching and writing memorandums and accompanying the attorney to various lobbying events.  The Debtor only worked 5 to 10 hours a week for Gage & Tucker and was never offered a permanent position, despite his offer to relocate to the Kansas City office.

In May of 1994, the Debtor took and passed the Pennsylvania bar examination. The Debtor chose Pennsylvania, in part, because the essay portion of the exam would not be graded if he scored sufficiently highly on the multi-state portion of the exam.

The Debtor continued to look for a job in the Philadelphia and DC areas.  His search was unsuccessful and he returned to Dallas in August of 1994.  The Debtor used various resources to search for legal employment in the Dallas area, including SMU's placement office, blanket mailings to law firms identified in Martindale Hubbell, as well as career counseling seminars and other networking venues.  The Debtor was temporarily

employed, in a non-legal position, by a company that repurchased timeshares from individuals.

By the fall of 1994, the Debtor had returned to Pennsylvania to look for employment again. At about this time, the Debtor's educational loans became due and the Debtor attempted to consolidate them. The Debtor also sought economic forbearances and alternate repayment options based upon his unemployed status and his attempt to consolidate the loans into one manageable payment.

In January of 1995, the Debtor finally obtained full-time employment as an associate with a small transactional firm, Cerullo, Datte & Wallbillich, P.C. ("Cerullo"), in Pottsville, Pennsylvania. Cerullo consisted of three partners and three associates. Cerullo primarily serviced one client, a local coal company named Redding Anthracite,. The Debtor's annual salary, including bonuses, was $30,000.

At some time in 1995, the Debtor married. On December 14, 1995, the Debtor and his wife had a son, Payton. For the period from 1995 until 1997, while the Debtor was employed, he made the required payments on his student loan obligations. In April or May of 1997, Cerullo terminated the Debtor following an altercation with his employer regarding a fee-splitting relationship with a non-attorney.

After his termination from Cerullo, the Debtor attempted to practice on his own but was unable to earn enough money to support himself and his family. In July of 1998, the Debtor filed for divorce. His his wife retained a lawyer from Cerullo, his former employer, as her counsel. The divorce proceedings proved to be extremely contentious on all issues, including division of the marital estate, and custody and visitation of their

minor child.[2]

The Debtor resided in his office until he could no longer pay even his minimal living expenses and utilities.  The Debtor was unable to develop a practice or client base in Pennsylvania, and at the end of 2000, decided to move back to Dallas again.

Upon the Debtor's relocation to Dallas, he attempted to pursue employment opportunities through the use of legal search firms, classified advertising, listings of corporate in-house counsel employers, as well as SMU's career placement office, networking, and other career counseling services.  During this period, the Debtor was able to secure one temporary assignment related to discovery issues which lasted for approximately 5 weeks.  The Debtor also renewed a prior employment inquiry with Reed Elsevier Inc. / Lexis Nexis ("Lexis") and, in July of 2001, was able to secure a temporary placement with Lexis.

The Debtor made voluntary payments in the amount of $50 per month to TERI for the period October 2001 through April 2004.  The Debtor has continually attempted to make alternate repayment arrangements with Defendants and their predecessors in interest.  Despite the Debtor's repeated attempts to negotiate a repayment schedule, Defendants refused to accept less than full payment of the obligations and only permitted the Debtor to delay the repayment process by taking hardship forbearances and deferments.

The Debtor has been employed with Lexis since July of 2001 where his starting salary was $30,000 per year.  The Debtor currently earns approximately $46,000 per

---

[2]    After four years of continuous litigation, appeals and, ultimately, criminal prosecutions, in January of 2002, the Debtor obtained permanent custody of his son.

year.[3]  The Debtor's employment with Lexis continues to be on a temporary basis.  The project for which he was initially employed is scheduled to be complete in the first quarter of 2007.  The Debtor has received no assurances from Lexis that a permanent offer of employment will be extended to him after the project is completed.

The Debtor's job functions at Lexis consist of writing case law summaries and 'taxonomy', or the classification of cases under the Lexis head note system.  The Debtor's 'taxonomy' function involves the creation of Boolean searches so that the software utilized by Lexis will eventually be able to sort cases internally without the need for any user input.  The Debtor also reviews case law summaries written by other employees.  The Debtor's position does not involve any management functions, such as hiring, firing, mentoring, or scheduling.  The Debtor performs his job at his home utilizing company software, which is accessed through an internet site.

In July of 2005, the Debtor applied for admission to the Texas State Bar.  At the time of trial, this application remained pending.  Before applying for admission to the Texas bar the Debtor was required to pay the Pennsylvania State Bar certain fines related to delinquent continuing education requirements.  The Debtor received some funds from a friend to pay these fees, along with, his Texas State Bar application fee.

The Debtor's income for 2002 through 2004 was $36,198, $37,809 and $42,310.98, respectively.  As shown on the Debtor's Earning Statement for the Period Ending June 30, 2005 (the "6/30 Earning Statement"), the Debtor's current gross wages are $1,837.92 bi-monthly or $3,675.84 per month.  Defendant's Exhibit E.

Schedule I of the Debtor's Schedules shows that the Debtor receives $342 per

---

[3]     At trial, the Debtor testified that, unlike in past years, he would not receive any additional performance or merit bonuses for 2006, other than the $300 awarded in the first quarter of 2006.

month in child support.  Schedule I of the Debtor's Schedules also shows that the Debtor receives approximately $40 per month from the sale of a book he has written on divorce. The Debtor's testimony at trial indicated that the income received from the book sales decreases each month now that the book has been on the market for a few years.  The income received from book sales is not a consistent or reliable source of income.

The Debtor's current net monthly income is $3,574.56.  This amount reflects a deduction of $443.28, the amount withheld for federal income tax, Social Security taxes, and Medicare expenses, as calculated from the 6/30 Earning Statement, and includes the child support payment received monthly from his ex-wife.

The Debtor lists his expenses on Schedules I and J.  After considering the expenses noted as deductions from gross income on Schedule I, plus the expenses listed in Schedule J, the Debtor identifies monthly expenses in the total amount of $3,350. Inclusive in this amount is an expense item of $50 for monthly payments to TERI and an expense of $26 for the Debtor's DSL connection, which is reimbursed by his employer. With these modifications, the amount of the Debtor's current reasonable monthly expenses before student loan payments is $3,259.

The Debtor currently resides in a two-bedroom apartment with his 9-year old son. The Debtor drives a 2003 Saturn Ion, which is titled in his mother's name because of his inability to obtain credit.  The Debtor pays the note and insurance with respect to this vehicle.  Other than ordinary household effects, the Debtor has no valuable assets.

The Debtor has not been able to find any position through which greater income could be realized.  At all times relevant times, the Debtor has searched for employment in good faith.

## IV.   LEGAL DISCUSSION

In an action to determine the dischargeability of a debt, the burden of proof is by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[4]  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)* 107 F.3d 355, 356 (5th Cir. 1997); *In re Whitaker*, 225 B.R. 131, 139 (Bankr. E.D. La. 1998).

### A.   Section 523(a)(8) / Dischargeability of Student Loans

Section 523(a)(8) of the Bankruptcy Code excepts from an individual's discharge "a loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit . . . unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." This exception to discharge "was enacted to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans."  *In re Hornsby*, 144 F.3d 433, 436-37 (6th Cir. 1998).  It also protects the continued financial viability of educational loan programs. As the Second Circuit has observed –

> . . . because student loans are generally unsecured and recent graduates often have few or no assets, these debtors have an incentive to try to discharge their educational loans in bankruptcy.  If successful, they can then enjoy the higher earning power the loans have made possible without

---

[4]    A fresh start is not promised to all who file for bankruptcy relief, only to "the honest but unfortunate debtor."  *Grogan,* 498 U.S. at 286-87.

the financial burden that repayment entails.  Congress enacted §523(a)(8) because there was evidence of an increasing abuse of the bankruptcy process that threatened the viability of educational loan programs and harm to future students as well as taxpayers.  Congress recognized that this is an instance where a creditor's interest in receiving full payment of the debt outweighs the debtor's interest in a fresh start.

*Cazenovia College v.* Renshaw *(In re Renshaw)*, 222 F.3d 82, 86-87 (2nd Cir. 2000) (citations omitted).

The Supreme Court has recently stated that section 523(a)(8) is "self-executing" and that "[u]nless the debtor affirmatively secures a hardship determination, the discharge order will not include a student loan debt."  *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004).  In other words, student loan debt remains due until there is a determination that the loan is dischargeable.

As the statutory text suggests, discharge of a student loan is possible if the debtor can demonstrate, by a preponderance of the evidence, that to hold the student loan non-dischargeable would impose an "undue hardship" upon the debtor and his dependents. There is no definition of the term "undue hardship" in the Bankruptcy Code, nor has any particular judicial definition been endorsed by the United States Supreme Court.  *Kettler v. Great Lakes Higher Educ. Serv. Corp. (In re Kettler)*, 256 B.R. 719, 722 (Bankr. S.D. Tex. 2000).  However, as courts have attempted to balance a debtor's need for a fresh start with the need to protect student loan programs and their participants, a growing consensus has emerged regarding the evidentiary foundation necessary to establish an undue hardship.  Most courts have endorsed the three-prong test articulated by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2nd Cir. 1987), under which a debtor is required to show:

(i)     that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loan;

(ii)    that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and

(iii)   that the debtor has made good faith efforts to repay the loan.

*Id*. at 396.  This test was adopted by the Fifth Circuit in *In re Gerhardt*, 348 F.3d 89, 91 (5th Cir. 2003).  Thus, this Court will review the Debtor's evidentiary presentation in light of the *Brunner* factors to determine whether he has met his burden of demonstrating the existence of an undue hardship.

## 1.      The First Prong of *Brunner*

Under the first *Brunner* element, the Debtor is required to show that he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if he is forced to repay the student loan.  This analysis is actually a two-step process encompassing: first, the evaluation of the debtor's present standard of living based upon his lifestyle attributes which appear from the record; and second, whether the forced repayment of the student loan obligation will preclude the debtor from maintaining a minimal standard of living.  *Naranjo v. Educational Credit Mgmt. Corp. (In re Naranjo)*, 261 B.R. 248, 254-55 (Bankr. E.D. Cal. 2001).  The test requires "more than a showing of tight finances, and is not met "merely because repayment of the borrowed funds would require some major personal and financial sacrifices."  *Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 26 (Bankr. D. Conn. 1999), citing *Pennsylvania Higher Educ. Assistance Agency v. Faish*

*(In re Faish)*, 72 F.3d 298, 306 (3rd Cir. 1995), *cert. denied*, 518 U.S. 109 (1996). However, the test does not require a debtor to demonstrate that repayment of the loan would cause him and his family to live at or below poverty level.  *Lebovitz v. Chase Manhattan Bank (In re Lebovitz)*, 223 B.R. 265, 271 (Bankr. E.D.N.Y. 1998).

### 2.    The Second Prong of *Brunner*

The second prong of the *Brunner* analysis considers the likelihood that the debtor's financial situation will improve sufficiently in the future to permit him to resume the payment of his educational loans, *United States Dept. of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 181 (C.D. Cal. 2000) and is "intended to effect the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt."  *United Student Aid Funds, Inc. v. Nascimento (In re Nascimento)*, 241 B.R. 440, 445 (B.A.P. 9th Cir. 1999).  This factor "more reliably guarantees that the hardship presented is 'undue'."  *Elmore,* 230 B.R. at 27 (citing *Brunner*).

### 3.    The Third Prong of *Brunner*

Finally, the third inquiry under the *Brunner* test is whether the debtor has made a good faith effort to repay his student loan.  This aspect recognizes that undue hardship "encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control'."  *Stein v. Bank of New England (In re Stein)*, 218 B.R. 281, 288 (Bankr. D. Conn. 1998), citing *Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993).  "Moreover, upon

receiving the taxpayer-guaranteed loan and consequent educational benefit, a debtor assumes an obligation to make a good faith attempt at full repayment as measured by his efforts to obtain employment, maximize income, minimize expenses, and to undertake other reasonable efforts to insure repayment of the obligation. *Elmore,* 230 B.R. at 27 (citing *Brunner*); *Stein,* 218 B.R. at 288. The "[f]actors to be considered include the number of payments the debtor made, attempts to negotiate with the lender, proportion of loans to total debt, and possible abuse of the bankruptcy system." *Wallace*, 259 B.R. at 185.

## V.    ANALYSIS

The actual amount of the student loan debt is $231,156.30, however this amount does not take into account any additional interest or attorneys fees and reflects the balance on each of the loans at or around the time of the Complaint. Accordingly, the Court will use the amount of $235,000 to determine the feasibility of payments required with respect to these obligations.

In this case, the Debtor has established the first prong of the *Brunner* test. Based on current income and expenses, the Debtor cannot maintain a minimal standard of living for himself and his son if he is forced to repay his student loans. The Court, in reviewing the Debtor's income and expenses, looks to the 'totality of circumstances' and finds that, while the Debtor may be able to reduce his monthly food expense, the Debtor's budgeted expenses as a whole, do not exceed the Debtor's basic needs, nor do they appear to be unreasonable. The Court specifically notes that the Debtor does not allocate any funds for child care, personal needs, or emergencies.

In addition, the Debtor allocates only $65 per month for clothing and laundry, which seems modest considering the age of his son.  The Court also notes that the Debtor lacks any exempt assets, such as savings, collectibles, or a homestead, which might be used to pay unexpected future bills.  Accordingly, the Court concludes that the Debtor's monthly expenses in the amount of $3,259 are reasonable and are expressly tailored to meet the Debtor's basic needs.

Defendants argue that the Debtor has not utilized all available resources to obtain a better job and that he could acquire a job practicing law with a firm in the Dallas / Fort Worth area.  Unlike the Debtor in *Gerhardt*, the Debtor herein is not choosing to obtain a low-paying job; the Debtor's circumstances prevent him from obtaining more lucrative employment in the field in which he was trained.  As discussed in greater detail with respect to the second prong of the *Brunner* test, the Debtor's financial distress is not self-imposed.

The Debtor's current net monthly income is $3,574.56.  If the Debtor were forced to repay the student loan obligations, which the Court estimates would require payments of approximately $2,804.56 per month,[5] he would be required to live on the remaining $770 per month that he earns in his current job.  The Debtor cannot maintain a minimal standard of living for himself or his dependent, on $770 per month.  Where a debtor's monthly expenses, inclusive of student loan payments, exceeds his monthly income, the present inability to maintain a minimal standard of living has been proven.  *Gerhardt*,

---

[5]     The record is unclear as to the monthly payments currently requested by Defendants or the current term of these loans.  Accordingly, the Court estimates that the loans, which bear interest at 8% per annum, would, assuming a ten-year amortization, require: (i) a monthly payment of $771.77 to TERI to repay a loan in the amount of $63,610.05, and (ii) a monthly payment of $2,032.80 to ECMC to repay a loan in the amount of $167,546.25.  Accordingly, the Debtor would be required to make total monthly payments with respect to the student loan obligations in the amount of $2,804.56.

348 F.3d at 92 ("Given that [the Debtor's] monthly expenses exceed his monthly income, [the Debtor] has no ability at the present time to maintain a minimal standard of living if forced to repay his loans").  Thus, based on the Debtor's current income and expenses, the Court concludes that he cannot maintain a minimum standard of living if forced to repay his student loan debt and the first prong of the *Brunner* test has been met.

The second prong of the *Brunner* test looks to the future and considers whether any 'additional circumstances' exist which will cause the Debtor's inability to repay his student loans "to persist for a significant portion of the repayment period of the loans." The Court first looks to the Debtor's history, as providing some evidence of the Debtor's future financial prospects.  Here, the Debtor graduated law school with extremely low grades.  The Debtor made extensive efforts to obtain a job as a practicing attorney upon obtaining his J.D., his L.L.M., and repeatedly thereafter.  He contacted or attempted to contact numerous law firms but received no offers of employment.  Notwithstanding the Debtor's efforts, in the 12 years since the Debtor graduated from law school, the Debtor has only managed to obtain one job as a practicing attorney, and he was terminated from that job a little more than two years later.  The Debtor did clerk for law firms while attending law school, but those firms did not extend him any offers of permanent employment.  Notably, the Debtor's current job is a long-term *temporary* job that is scheduled to end in early 2007.

The legal market is highly competitive, particularly given the number of candidates that graduate every year from this country's law schools.  Unfortunately, the Debtor did not graduate with satisfactory academics and has very little actual legal experience.  Aside from his transactional practice in Pennsylvania and representing

himself in his extremely litigious divorce, the Debtor has had very little formal training in the 12 years since graduating from law school.  The Debtor was actively engaged in the practice of law for approximately 2 years and that employment ended approximately 8 years ago.  In addition, the skills which the Debtor has acquired working for Lexis, while related to law, constitute only a fraction of the skills necessary to practice law. Summarizing and indexing cases is obviously a necessary attribute in developing a career as a lawyer, but is not equivalent to all that encompasses the practice of law, including analysis and application of case law to actual facts, negotiating contracts, representing and advising clients, working with and/or managing others, appearing in court or before administrative bodies of government, and developing and maintaining client relationships.

These factors have limited the Debtor's ability to find employment as a lawyer and will continue to limit the Debtor's future earning potential in the legal field.  The Debtor's lack of experience and marketable legal skills were not present when the student loan obligations were incurred, nor did the Debtor anticipate at the time that he embarked on his college education that he would be subject to this misfortune.

The Debtor is a single parent, which also limits the type of employment that he can accept without materially increasing his child care and related expenses.  The Debtor is currently able to bring his son to school in the morning, pick him up in the afternoon, supervise his homework, and generally closely monitor his activities.  In order to continue this practice, the Debtor would need employment that either (i) allows him to work at home, (ii) provides the flexibility to work the hours he is currently working, or (iii) provides a significant increase in salary to cover the cost of hiring others to care for

his son.  Even if the Debtor were able to obtain a traditional legal position, the Debtor would incur the expense of child-care, as well as other expenses associated with working in an office environment and professional expenses such as bar dues and occupation taxes.

The Debtor's current employment will not continue beyond the first quarter of 2007.  In addition, when the Debtor was employed in the private practice of law, his gross income was only $30,000 per year, which is significantly less than he is earning today, and he was terminated from that employment.  Given the Debtor's limited marketability and employment history, the Debtor is unlikely to secure employment that is sufficiently more lucrative than his current job, taking into account the additional costs associated with private practice that would allow the Debtor to increase his income sufficient to cover the additional expenses.  The Debtor's lack of marketability is an additional circumstance that will continue to limit his ability to address his student loan obligations indefinitely into the future.

If the student loans are not discharged, the Debtor will remain in default of his obligations, and Defendants will eventually, if they have not already, accelerate the debt and proceed to collection proceedings and remedies.[6]  The Court, therefore, finds that (i) the Debtor's financial condition will not likely improve to the extent necessary to allow the Debtor to pay the total amount owed to Defendants, and (ii) the Debtor's inability to

---

[6]    *See In re Barron,* 264 B.R. 833, 839, n. 5 (Bankr. E.D. Tex. 2001) ("Though creditors are generally prohibited under Texas law from seeking wage garnishments except under very limited circumstances, the Higher Education Act of 1965, as amended in 1991 and 1998, and as codified in 20 U.S.C. §1095(a) provides that a federal guaranty agency can involuntarily garnish up to ten percent of a student loan debtor's disposable wages.  This garnishment procedure expressly preempts any state law protections which would otherwise prevent such garnishments.") (citing *Nelson v. Diversified Collection Svcs., Inc.,* 961 F.Supp. 863, 872 (D. Md. 1997)).

**MEMORANDUM OPINION / Young (04-4164)**                    **PAGE 17 OF 17**

repay his student loans will persist for a significant portion of the repayment period.  The Debtor has satisfied the second prong of the *Brunner* test.

Under the third prong of the *Brunner* test, the Debtor must prove that he has made good faith efforts to repay his loans.  The Debtor has demonstrated such good faith.  The Debtor made regular payments on his loans for the period that he was employed from 1995 to 1997.  The Debtor continually notified his lenders of his financial problems, solicited their assistance in formulating a reasonable repayment plan, and made minimal payments with respect to the TERI loans for the period from October of 2001 to April of 2004.

Defendants assert that there are income contingent repayment plans available through the United States Department of Education and that the Debtor's failure to investigate or utilize such program is evidence of a lack of good faith.  The Court disagrees that the Debtor must participate in such a repayment plan to meet the burden of good faith or to obtain an undue hardship discharge.  *See, In re Carlson*, 273 B.R. 481,486 (Bankr. D.S.C. 2001) ("The Court is of the opinion that to put a debtor to the impossible burden to seek out every possible [income contingency repayment] program in existence was not contemplated by Congress when §523(a)(8) was enacted.").[7]  In fact, in this case, the Debtor attempted to negotiate alternate payment plans with his lenders continuously from the instant he began experiencing financial difficulties until shortly before the bankruptcy filing.  The repayment plans that he offered were similar in terms to the income contingency plans available with respect to certain federal loans.  Despite

---

[7]    *Accord, Nanton-Marie v. U.S. Dept. of Education*, 303 B.R. 228, 235 (Bankr. S.D. Fla. 2003) ("The Court is not impressed with the argument that the failure to participate in the Ford program is a bar to an undue hardship discharge.  While that program may be available, there is no section of the Bankruptcy Code that requires it as a condition precedent to an undue hardship discharge.) (citing *Korhonen v. Educational Credit Management Corp. (In re Korhonen)*, 296 B.R. 492 (Bankr. D. Minn. 2003).

the fact that Defendants failed to accept any of these offers, the offers were made with the intent to provide some payment to the lenders on the student loan obligations and are particular evidence of the Debtor's good faith.

The Court concludes that the Debtor has acted in good faith and that the third prong of the *Brunner* test is met.  The Debtor has never abandoned his obligation to repay his student loans, he has paid when he could, sought forbearances and deferments when he was unable to make the scheduled payments, and has attempted to make some minimal amount of payments.

For the foregoing reasons, the Court finds that the Debtor cannot pay a debt of approximately \$235,000, bearing interest at 8% per annum over a ten year term, which is approximately \$2,804.56 per month.  Accordingly, the Debtor has sustained his burden of proof under each element of the *Brunner* test for undue hardship under section 523(a)(8) and has established that repayment of the full debt constitutes an 'undue hardship.'  It is apparent, however, that the Debtor has the ability to pay some portion of the student loan obligations without undue hardship.

**B.    Partial Discharge under section 105(a)**

Some courts have disputed the ability of a bankruptcy court to utilize its equitable powers to partially discharge a debtor's student loan and assert that the determination of the dischargeability of a student loan obligation is an all-or-nothing proposition.  *See, e.g., Andersen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 129-37 (B.A.P. 8th Cir. 1999); *United Student Aid Funds, Inc. v. Taylor (In re Taylor)*, 223 B.R. 747, 753 (B.A.P 9th Cir. 1998); *Mallinckrodt v. Chemical Bank (In re*

*Mallinckrodt)*, 260 B.R. 892, 904 (Bankr. S.D. Fla. 2001); and *Brown v. Union Financial Services, Inc. (In re Brown)*, 249 B.R. 525 (Bankr. W.D. Mo. 2000). Other courts have concluded that it is, in fact, appropriate for a bankruptcy court to utilize its equitable powers as codified in section 105(a) of the Bankruptcy Code to issue only a partial discharge of a debtor's student loan obligations under appropriate circumstances in order to balance the restructuring of the particular debtor-creditor relationship in that case. *See, e.g.*, *Great Lakes Higher Education Corporation v. Brown (In re Brown)*, 239 B.R. 204, 210-12 (S.D. Cal. 1999); *Rivers v. United Student Aid Funds, Inc. (In re Rivers)*, 213 B.R. 616, 618 (Bankr. S.D. Ga. 1997); *Wetzel v. New York State Higher Educ. Servs. Corp. (In re Wetzel)*, 213 B.R. 220, 226-27 (Bankr. N.D.N.Y. 1996); *Heckathorn v. United States (In re Heckathorn)*, 199 B.R. 188, 195-96 (Bankr. N.D. Okla. 1996); *Fox v. Student Loan Mktg. Ass'n (SLMA) (In re Fox)*, 189 B.R. 115, 117 (Bankr. N.D. Ohio 1995).

While a bankruptcy court must always exercise due caution to insure that its equitable powers are exercised even-handedly and in a manner consistent with the provisions of the Bankruptcy Code, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988), the scope of that restriction should not be exaggerated. Section 105(a) specifically "authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code," *United States v. Sutton*, 786 F.2d 1305, 1307 (5th Cir. 1986). It is interpreted liberally, *Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995), and while that certainly "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity," *Sutton*, 786 F.2d at 1308,

neither can an approach be justified which effectively writes section 105(a) out of the Bankruptcy Code.

Bankruptcy remedies are rooted in equity in recognition of the fact that a fair and proper restructuring of a debtor-creditor relationship occasionally creates a need for flexibility within the statutory parameters and objectives of the Bankruptcy Code. The United States District Court for the Eastern District of Texas has suggested that the bankruptcy court has authority to utilize its equitable powers as codified in section 105(a) to, under appropriate circumstances, restructure the relationship between a debtor and a student-loan creditor. *See, Educ. Credit Mgmt. Corp. v. Blake,* No. 4:05-CV-00138-DF (E.D. Tex. Oct. 28, 2005) ("Additionally, if, after additional findings, the Bankruptcy Court find facts to support an undue hardship, the [District] Court questions whether a partial discharge under the circumstances may be appropriate).[8]

With respect to partial discharge, the Court concludes that because the Debtor's current net income is $3,574.56, and the Debtor's current monthly expenses, as revised by the Court, total $3,259, the Debtor has disposable income of approximately $315.56 per month. The student loans both bear interest at the rate of 8% per annum, and, given the Debtor's age, a repayment term of twenty-five years is appropriate. Monthly payments of $315.56, for 25 years, at an 8% interest rate, will result in payment of a principal obligation of $40,885.38 and interest of $53,782.62 with respect to these

---

[8]    *Accord, Graves v. Myrvang (In re Myrvang)*, 232 F.3d 1116 (9th Cir. 2000); *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir. 1998); *Nary v. The Complete Source (In re Nary)*, 253 B.R. 752, 767 (N.D. Tex. 2000); *Hollins* v. *U.S. Dept. of Education* (*In re Hollins*), 286 B.R. 310, 317 (Bankr. N.D. Tex. 2002); *In re Barron*, 264 B.R. 833 (Bankr. E.D. Tex. 2001). *But see*, *Educ. Credit Mgmt. Corp. v. Carter*, 279 B.R. 872, 876 (M.D. Ga. 2002) (partial discharge of student loans not allowed); *Illinois Student Assistance Com'n v. Cox*, 273 B.R. 719, 724 (N.D. Ga. 2002) (student loans are either dischargeable or non-dischargeable); *In re Roach*, 288 B.R. 437 (Bankr. E.D. La. 2003) (not adopting partial discharge); *In re Pincus*, 280 B.R. 303 (Bankr. S.D.N.Y. 2002) (partial discharge of student loans not allowed); *In re Mallinckrodt*, 260 B.R. 892 (Bankr. S.D. Fla. 2001).

**MEMORANDUM OPINION / Young (04-4164)**                                  **PAGE 21 OF 21**

obligations, or a total payment of $94,668. The Court, therefore, finds that the Debtor could pay (i) $86.77 per month for a period of 25 years to TERI, which equates to a principal payment in the amount of $11,243.47 bearing interest at 8% per annum and (ii) $228.78 per month for a period of 25 years to ECMC, which equates to a principal payment in the amount of $29,641.90 bearing interest at 8% per annum. All remaining amounts owed to TERI and ECMC shall be discharged pursuant to 11 U.S.C. §523(a)(8).

## VI.    CONCLUSION

As a result of the foregoing findings and conclusions, the Court concludes that the Debtor's student loan obligations shall be discharged as provided above. Accordingly, a judgment will be entered granting the Debtor's ORIGINAL COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT in part and denying it in part. This decision disposes of all issues pending before the Court. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party. Any items identified herein as findings of fact may also be construed to be conclusions of law and are adopted as such. Items identified herein as conclusions of law may also be construed to be findings of fact and are adopted as such.

Signed on 6/27/2006

_Brenda T. Rhoades_                    MD
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE